No. 19,345.

LUELLA O. DANIELS, *Appellee*, v. HARRY DICK et al., Partners, etc., *Appellants*.

### SYLLABUS BY THE COURT.

1. PERSONAL INJURIES—*Mistake in Compounding Medical Prescription—Arsenical and Strychnine Poisoning—Expert Evidence Not Conclusive.* In an action against druggists to recover damages for injuries alleged to have been caused by a mistake in compounding a medical prescription it is held that the expert evidence does not conclusively show that the injuries complained of did not result from arsenical and strychnine poisoning.

2. SAME—*Refusal to Give Requested Instruction Relative to Burden of Proof, Error.* In this case the instructions, aside from those defining the issues as raised by the pleadings, were quite general and contained mere abstract propositions of law applicable to any case of negligence. *Held,* that under all the circumstances of the case it was error to refuse to give an instruction requested by defendants to the effect that the burden of proof was upon the plaintiff to establish by a preponderance of the evidence that the capsules submitted by her to the expert witnesses for chemical analysis were identical with and of the same lot purchased from the defendants, and that the capsules had not been tampered with nor in any manner changed, and that unless the jury so found, the plaintiff was not entitled to recover.

Appeal from Atchison district court; WILLIAM A. JACKSON, judge. Opinion filed April 10, 1915. Reversed.

*James M. Challiss,* of Atchison, *S. D. Bishop,* and *W. B. Brownell,* both of Lawrence, for the appellants.

*R. E. Melvin,* of Lawrence, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The defendants seek to reverse a judgment in plaintiff's favor for damages alleged to have been caused by their negligence in filling a medical prescription.

The defendants are residents of Lawrence where they have maintained a drug store for the last twenty-five years. Both are registered pharmacists of high standing in their profession, and each has been president of the State Pharmaceutical Association. William Dick has served two terms as president of the State Board of Pharmacy under appointment by the governor. The plaintiff is forty-two years of age and is the mother of nine children, eight of whom are living and five of whom were born during eight years. In the spring of 1911 she was entering upon a change of life, or menopause, and had been suffering for some time from malaria and biliousness. Her family physician, Dr. Risdon, of Leavenworth, had been prescribing for her, and on May 13 she sent him a letter describing her symptoms. He wrote a prescription and gave it to her husband, who several days later had it filled by the defendants at their drug store in Lawrence. The prescription was as follows:

> "Quin Sulph...........  ———
> Salol aa.............. Z s s
> Cu Arsenite Grs...... 15/100
> Strych Sulph Grs...... 15/60
> M fr. caps No. 15
> Sig—one every 4 hrs."

On the 22d of May, 1911, the plaintiff claims that she took two of the capsules; the first at three o'clock in the afternoon, two hours after having eaten a hearty meal of fried pork, potatoes and bread. The first dose had no effect until after she took the second about seven-thirty in the evening, soon after eating a supper consisting of meat, bread and potatoes. Her testimony is that in about an hour after the last capsule was taken she became very nervous and went to bed. Some time after this she was taken with severe paroxysms of pain in the stomach. Her husband gave her a pint of cream and a pound and a half of lard. She also took lukewarm water. The doctor arrived about eleven o'clock and gave her a hypodermic injection, after which her

spells of suffering were not so severe. She was not able to vomit even after having taken the lard, cream and hot water until she used mechanical means, and then vomited twice. The doctor informed her that he did not think she would be sick any more. The next day she was able to come downstairs and did so each day thereafter. She called no physician after that and had no medical attention of any kind except that she took medicine each night for constipation and biliousness, as she had been doing for some time before. Prior to taking the prescription she had applied for admission to the Royal Neighbors and passed a satisfactory examination for insurance. Three weeks after her illness she telephoned to one of the officers about being initiated and was informed that she must be in good health in order to take it. With this information she requested that she be initiated. Her testimony is that she was able to ride to the place, climb the stairs and take the initiation. The lodge issued a policy on her life for $1500, payable to her husband. The testimony of some of the members of the order is that she appeared to be in good health and said she was much better than she had been in May at the time of her sickness. She claims that since taking the prescription she had been nervous, sleepless at night and lacked energy; that the following winter Dr. Risdon gave her electric treatments and she continued taking pills for biliousness and constipation; that during this time she had done light housework, helped with the dishes, looked after the children and had done some sweeping, but that she felt nervous and blue and lacked energy. She testified that in July, 1912, she passed a renal stone and was in a hospital four different times, staying about two weeks on each occasion, and spent a week at Excelsior Springs.

The evidence also shows that she attended social gatherings in the neighborhood; that she went to Leavenworth and drove about the county visiting her friends; drove to Lawrence and delivered a half bushel

of peaches to a customer, carrying them from the wagon. The testimony further shows that she went to a hospital in Leavenworth on four different occasions, staying about two weeks each time.

In May, 1912, one year after the defendants sold the prescription, plaintiff brought this action in Atchison county, having obtained service upon defendants there, although all the parties were residents of Douglas county. The plaintiff's husband testified that he gave several of the remaining capsules from the original prescription to different expert chemists for analysis. Their testimony shows that these capsules when analyzed contained more arsenic and strychnine than the prescription called for. The amount of these poisons varied considerably in the different capsules. The drug analyst of the pharmacy department of the State University made an analysis of four of the capsules in June, 1912. His testimony follows:

"In two of the capsules I found an average of .925 grains of copper arsenite. The average weight of the strychnine was .58. The copper arsenite being $9/10$ of a grain and the strychnine sulphate being $58/100$ of a grain. That is for two capsules. The two capsules contained 11 and $99/100$ grains; each one averaged that. . . . The two capsules that I weighed had an average of $599/100$ grains, that is the contents. There was a difference between what they weighed and what the prescription called for which showed that possible 30 had been added to the gross weight of the capsules. The difference of the contents of the different elements was very marked. The average of the copper arsenite in the first two capsules was $92/100$ grains and the average of sulphate of strychnine was $55/100$, while in No. 4, the strychnine was only $20/100$ and in No. 3 it was $46/100$. I did not determine the quantity of quinine or salol.

. . . . . . . . . . .

"Q. These capsules received by you were not sealed, the capsules themselves? A. No. They can be easily taken apart.

"Q. The cap could be removed, some added to it and the cap put on and the matter not be detected in any way except by chemical analysis? A. Yes."

In June, 1911, the plaintiff's husband went to the defendants' store and claimed that a mistake had been made in the prescription. He had in the meantime procured a similar prescription to be compounded by other druggists. He exhibited to the defendants a box said to contain capsules of the original prescription, and the defendants took one which they say was given for analysis a few days later to Professor Havenhill of the State University, who testified as follows:

"I found $54/100$ of a grain of copper arsenite and $3/8$ of a grain of strychnine. I found present acetic acid radical. Acetic acid radical is not a part of copper arsenite, and it is of paris green. Paris green is easily obtainable. It is sold by the pound. I made a test of the bottle of copper arsenite owned by Dick Brothers and determined that it did not contain acetic acid."

Another professor of chemistry at the State University testified that acetic acid or acetic radical is no part of what is known as copper arsenite, but is found in paris green. The defendants testified that they kept no paris green near the prescription case but that it was kept in the cellar with the stock of paints and oils.

One of the contentions of the defendants is that the verdict is not sustained by the evidence; that proof of plaintiff's condition since the taking of the medicine is insufficient of itself to establish a liability against them unless such proof comes from witnesses competent to testify that her condition was the direct result of taking the medicine; that only witnesses having special skill or knowledge with reference to such matters are competent to testify. This contention will be referred to later.

On the other hand, the plaintiff contended that the evidence shows conclusively that prior to May 22, 1911, she was a strong, hearty woman, never having had any serious sickness, and that after taking the two capsules she showed all the symptoms and conditions which the experts say usually result from arsenic and strychnine poisoning; and counsel insist that it is impossible to

read the evidence of Drs. Cross, Goddard, and Risdon, the family physician, and arrive at any other conclusion than that her condition was caused solely by taking these poisons. We think there was evidence sufficient to warrant the submission of the case to the jury, although we are not able to concur in all the claims of counsel for the plaintiff. Her husband testified that she had been taking medicine for biliousness for some time prior to the spring of 1911, and during this period he purchased pills for her use, one hundred in a box, and could not tell how many prescriptions for her he had obtained at other drug stores. When Dr. Goddard examined her in the fall of 1911 he found her suffering from a displacement of the womb and troubles incident to the period in the life of women known as the menopause. He was a witness for the plaintiff, and on cross-examination respecting the symptoms shown by her at the time of her illness, said: "I have not the faintest idea on earth what caused it."

Dr. Risdon, the family physician, who wrote the prescription and who was acquainted with the plaintiff's state of health, her condition of life and the history of the case, testified:

"Every complaint that you have heard Mrs. Daniels make and every ailment you have ascertained her to be suffering from in any degree whatever, may have been caused by innumerable other things than this small dose of arsenic? A. Yes."

If the jury had determined from all the evidence that plaintiff suffered no serious effects by reason of arsenical and strychnine poisoning, but that her condition is the result of other causes, and had found for the defendants, it could not be said that the verdict was not sustained by evidence.

The defendants' main contention is that there is no competent evidence to support the judgment and that the court erred in not directing a verdict in their favor and in refusing a new trial. They do not ask us to

weigh the evidence. Their contention is that the verdict was arrived at without evidence of the character necessary to support it in this kind of an action; that the only competent testimony, that of experts who testified on both sides, conclusively demonstrates the absence of those conditions which are always present in cases of arsenical and strychnine poisoning. A number of physicians of extended practice and experience testified that purging, thirst and vomiting are characteristic and marked symptoms of arsenical poisoning. Most of them stated quite positively that in their opinion these are invariable typical symptoms of that kind of poisoning; also that extreme lucidity of mind is always a characteristic condition where a person has been poisoned by strychnine, and that unconsciousness does not appear and disappear, but that the patient remains conscious until the last convulsion, and then dies; that where a person lapses into unconsciousness at frequent intervals and where these periods of recurrent unconsciousness extend from one to one and a half hours, it is conclusively demonstrated that there was no strychnine poisoning. Their testimony, too, is that there are no cases of chronic arsenical poisoning arising from one or two doses so close together as to be practically one and which fail to produce any acute symptoms. The plaintiff, her husband and their son swore quite positively that for a period extending over an hour and a half the plaintiff relapsed several times into unconsciousness; that she had no thirst or purging; and that she vomited only after mechanical means had been applied.

In our view of the case it is unnecessary to comment upon the authorities cited by counsel in support of their contention that the only competent testimony to establish that plaintiff's condition was caused by the taking of the medicine is expert testimony, for the reason that we are unable to agree with their claims respecting the testimony given by the expert witnesses. If we were weighing the evidence it would be quite easy to say that

by far the greater weight of the expert testimony supports the defendants' claims with respect to the conditions usually found in cases of arsenical and strychnine poisoning; but, in our opinion, some evidence fell from the lips of expert witnesses to the effect that the usual characteristic symptoms in such a case might be delayed by reason of the peculiar conditions and circumstances attending the taking of the poison. Doctor Cross testified that the condition of the health is a very important factor in determining the severity in which such poisons will act; that a person in poor health will be affected more readily than one in good health; that a person taking such medicines on a full stomach is not affected as soon and does not suffer so severely as if the poison was taken on an empty stomach; that where poisons are taken on a full stomach the effect is distributed and the poisons absorbed more slowly. His testimony is that it would be possible, although not very probable, for a woman in ordinary health, after eating a reasonably hearty meal, to show no effect from the poison for as much as six hours, because she might have absorbed it so slowly that it did not produce the usual results at once. Doctor Goddard testified that the craving for water is not an indispensable symptom; that so long as the poison stays in the stomach there would be no violent thirst, but after it leaves the stomach thirst is one of the usual symptoms. Doctor Jones, one of the experts produced by defendants, testified on cross-examination that whether or not purging occurred would depend on whether plaintiff retained the poison and whether it was absorbed; that these symptoms might not supervene for hours, depending on her condition; that the eating of the hearty meal, as indicated, just before taking the poisons would delay absorption; that lard and pork would prevent the more rapid absorption, and to that extent delay the appearance of the symptoms. Other physicians gave similar testimony, and said also that the presence or absence of

the usual typical symptoms would depend upon the physical make-up and strength of the patient. Doctor Risdon testified that it is not an invariable symptom in strychnine poisoning that the patient is always conscious and lucid. On cross-examination he admitted that his opinion was based to some extent upon a case he had heard of but had not attended personally. The defendants' contention that all the expert testimony conclusively shows that the condition of the plaintiff could not have been the result of arsenical and strychnine poisoning is not sustained by the record. There was a conflict in the testimony in this respect, which the jury determined in favor of the plaintiff.

In this case, as often happens, there is not entire unanimity in the opinions of the medical experts. The doctors disagree. It may be conceded that the weight of their testimony supports the claims of the defendants. In *Smith v. Hays*, 23 Ill. App. 244, the druggist, just as in the leading case of *Thomas v. Winchester*, 6 N. Y. 397, sold to a woman extract of belladonna as extract of dandelion, and she claimed that her health had been permanently injured. Much the same contention respecting expert testimony was made as in the present case. The court commented upon the fact that the weight of the expert medical testimony seemed to be that the ills from which the plaintiff suffered were not the results of the balladonna taken by her, but the court commented upon the fact that the opinions expressed by some of the witnesses were based almost wholly upon knowledge obtained from the books and not from an extensive practice and experience with reference to the aftereffects of an overdose of poison, and that some of the experts were not willing to say that their opinions of what would naturally result from taking such poisons would be so in every case. It was held that the expert testimony did not conclusively show the injuries to be merely temporary. In the present case some of the opinions expressed by the medical experts

were based, to a large extent at least, upon knowledge obtained from the books, although others showed more or less practical experience with the effects of such poisons. In our opinion, therefore, it must be held that there was some expert testimony which tended to explain the absence of many of the characteristic symptoms and conditions in such cases, and to establish plaintiff's contention that she sustained injuries to her health as a result of arsenical and strychnine poisoning.

The plaintiff had alleged in her petition that the defendants, were reckless and careless in compounding the prescription. She was apparently unwilling to rest her proof of this charge upon the fact that analysis showed the presence of overdoses of arsenic and strychnine in some of the capsules, and upon the fact that she was taken sick after using the medicine, but on the contrary she attempted to show by the testimony of her husband that the prescription was compounded with recklessness and great negligence. The husband of the plaintiff testified that he was present when the prescription was compounded; that he stood behind the prescription case and that the defendant reached up and took two bottles, turned them up and shook them like salt on potatoes until he had got a certain amount of medicine on the board.

To overcome the evidence of negligence the defendants testified in their own behalf. William Dick, who prepared the prescription, stated in detail the manner in which he proceeded to compound it and testified that his brother came and stood by him and checked each step in the process. His brother testified to the same effect. Their testimony is that in every case where deadly poisons are part of a prescription to be prepared their custom invariably is to have two persons present, one to check the process and steps taken by the other. The evidence does not affirmatively show that either of the witnesses had an independent recollection of every step taken in the compounding of this

particular prescription. Of course, the jury was at
liberty to disregard it if not satisfied of its truth. They
also denied that Daniels was behind the prescription
case or saw the prescription compounded. They of-
fered the testimony also of expert pharmacists to prove
that the process defendants claimed to have followed
was the correct and proper method of compounding
this prescription. On the motion for a new trial the
judge of the court referred to the testimony of the
plaintiff's husband and said in substance that he did
not believe it, and that he did not think the jury be-
lieved it. The court used this language:

"The theory upon which the court disposed of the
question, and probably the jury had a similar one, was
that the defendants did not compound the Daniels pre-
scription in the manner stated by Mr. Daniels; that
Daniels did not see them compound the prescription
for his wife. Daniels might have seen Dick compound
a prescription, or prepare drugs for some other pur-
pose, but it is unbelievable that Dick compounded this
prescription in question in the manner which Daniels
describes."

No one can say what the jury may have believed or
disbelieved. The testimony of the husband was before
the jury in contradiction of that given by defendants
respecting the manner in which the prescription was
compounded. If the trial court was unable to believe
the testimony of the husband upon a material issue like
this, it is difficult to see why the court did not set aside
a verdict mulcting the defendants in the sum of $5000.
It is certainly no sufficient answer to say that the jury
must have naturally disbelieved and disregarded the
testimony. That the defendants had not used ordinary
and reasonable care in compounding the prescription
was one of the material allegations which plaintiff was
bound to establish by a preponderance of the evidence.

And this brings us to what we regard as the most
serious error complained of, which is the refusal of the
court to give an instruction requested by defendants

charging the jury that the burden of proof was upon the plaintiff to establish by a preponderance of the evidence that the capsules obtained by her for the purpose of chemical analysis were identical with and of the same lot purchased from the defendants, and that they had not been tampered with or in any manner changed, and unless the jury so found by a preponderance of the evidence the plaintiff was not entitled to recover. The court gave very general instructions with respect to the issues as defined by the pleadings, and in different instructions charged that it was incumbent upon the plaintiff to prove her case by a preponderance of the evidence, but all the instructions given, except those defining the issues, contained mere abstract propositions of law quite as applicable to any action for negligence as to this one. It has been held that the trial court should fairly, fully and specifically state to the jury all issues of fact made by the pleadings and evidence. (*Honick v. Railway Co.*, 66 Kan. 124, 71 Pac. 265.) That the capsules submitted for chemical analysis were identical with and of the same lot purchased from the defendants was an issue of fact not mentioned in the pleadings but raised by the evidence. The petition contained no averment with respect to this matter and yet it became an issue of fact of the uptmost importance in this case. The plaintiff had no analysis made of any of the capsules, so far as the evidence discloses, until long after her alleged sickness. The ones analyzed by Doctor Cross of Kansas City were not delivered to him until November, 1911, more than six months after the prescription was compounded. The four which were analyzed by the expert at the university were not delivered to Professor Sayre until January, 1912, and were not analyzed until the following June. The evidence shows that the capsules were unsealed and could be opened and part of their contents removed and other chemicals placed in them without any means of the fact becoming known.

While ordinarily it is not the duty of the court to single out a particular fact in evidence and refer to it in the instructions, we think that since the identity of the capsules in this case was so important, it was material error not to give an instruction such as the one requested. For these reasons the judgment must be reversed and the cause remanded for another trial.